J-S70034-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| GARY DAVIS, | : | |
| | : | |
| Appellant | : | No. 238 EDA 2016 |

Appeal from the Judgment of Sentence August 18, 2015
in the Court of Common Pleas of Philadelphia County,
Criminal Division, No(s):  CP-51-CR-0002634-2013

BEFORE:  OLSON, OTT and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.:          **FILED OCTOBER 19, 2016**

Gary Davis ("Davis") appeals the judgment of sentence imposed following his conviction of murder of the third degree and possessing an instrument of crime.[1]  We affirm.

In its Opinion, the trial court set forth in detail the relevant factual and procedural history, which we adopt for the purpose of this appeal.  **See** Trial Court Opinion, 3/4/16, at 2-21.

On appeal, Davis raises the following issues for our review:

I.    Did the lower court err in permitting the Commonwealth to introduce evidence that members of [Davis's] and [Irving Vaughn's ("Vaughn")] families were involved in an ongoing dispute arising out of alleged drug dealing activities[,] where this evidence failed to satisfy the admissibility requirements of Pa.R.E. 403 and 404?

---

[1] **See** 18 Pa.C.S.A. §§ 2502(c), 907(a).  Although Davis was convicted of additional related offenses, he does not challenge those convictions in this appeal.

II.     Was the evidence sufficient to support [Davis's] convictions for third-degree murder and possessing an instrument of crime[,] where the Commonwealth failed to prove beyond a reasonable doubt that [Davis] did not justifiably act in self-defense at the time of the shooting?

III.    Did the lower court abuse its discretion in sentencing [Davis] to a manifestly excessive aggregate sentence of 30 to 60 years imprisonment[,] where the court based its sentence solely on the seriousness of the offense and its impact on [Vaughn's] family[,] and failed to consider all relevant sentencing factors, including [Davis's] serious mental health issues, lack of a criminal record for violent offenses, and his expressions of remorse?

Brief for Appellant at 5 (capitalization omitted).

In his first issue, Davis contends that the trial court erred by ruling that the Commonwealth could elicit testimony at trial that Davis and Vaughn were members of rival drug dealing groups. *Id*. at 11. Davis points to the trial court's determination that the evidence was admissible because "[Davis's] motive to kill Vaughn grew out of the longstanding hostility and prior acts of violence resulting from drug dealing between the two families … much as it would have been had [Davis] and Vaughn simply been in more formal gang organizations." *Id*. at 13 (citing Trial Court Opinion, 3/4/16, at 25). Davis asserts that none of the evidence introduced at trial supports this theory. Brief for Appellant at 13. Davis points to the testimony of LeShay Hague ("Hague"), a cousin of Davis and a friend of Vaughn, that she did not sense any tension between the two men and that they "[didn't] have no beef." *Id*. (citing N.T., 2/11/15, at 168). Davis also points to his own testimony that he was not involved in any dispute with Vaughn or Vaughn's

- 2 -

family over drug-dealing territory. Brief for Appellant at 13. Based on this evidence, Davis argues, "there was no logical connection between [his] drug dealing activities and the shooting of [] Vaughn, and the contested evidence should have been deemed inadmissible." *Id*.

Davis contends that "the evidence was introduced solely to show his propensity for criminal activity and to invite the jury to speculate that[,] because he was involved in drug trafficking activity, he must be guilty of the charged crimes." *Id*. at 15. Davis asserts that such a basis for admissibility is prohibited by Pa.R.E. 404(b). Brief for Appellant at 15. Additionally, Davis claims that "the potential for unfair prejudice resulting from the admission of the evidence was high, as the trial court failed to instruct the jury on how to properly consider evidence of [Davis's] drug trafficking activity." *Id*. Davis argues that, rather than instructing the jury to consider the evidence as probative of the issue of motive, the trial court told the jury "only to consider the evidence as proof that [Davis] was selling drugs on the night of the shooting." *Id*. at 16.

The trial court set forth the relevant law, addressed Davis's first issue, and concluded that it lacks merit. *See* Trial Court Opinion, 3/4/16, at 22-26. We agree with the reasoning of the trial court and affirm on this basis as to Davis's first issue. *See id*.

In his second issue, Davis contends that his convictions for third-degree murder and possessing an instrument of crime cannot stand because

the Commonwealth failed to establish beyond a reasonable doubt that he did not act in self-defense during the confrontation with Vaughn. *See* Brief for Appellant at 17, 19-21. Davis maintains that he shot Vaughn in self-defense after unsuccessfully attempting to leave the restroom, and after Vaughn had pinned him against a wall. *Id*. at 17. Davis asserts that, as Vaughn was reaching for his gun, Davis noticed that Vaughn had a second gun, which Davis then grabbed and used to shoot Vaughn. *Id*. at 21. Davis claims that his "account of the incident dovetailed with the statement of [] Hague, who told Detective [Gregory] Santamala that …[w]hen the bathroom door flew open, [] Hague looked inside and saw [] Vaughn had [Davis] 'grabbed up by his collar in the corner of the bathroom, and he was reaching in his waistband for a gun.'" *Id*. at 21-22 (citing N.T., 2/12/15, at 23). Davis argues that the trial court erred by relying on the testimony of Albert Chu, M.D., an assistant medical examiner, that Vaughn would have been immediately paralyzed by the initial gunshot to the back of his neck, and that Davis's further use of deadly force against Vaughn was not necessary due to Vaughn's paralysis. *Id*. at 22. Davis contends that a claim of self-defense cannot be defeated "by showing that he delivered more blows than necessary as long as he was in the heat of conflict and reasonably believed he was fighting for his life." *Id*. (citing *Commonwealth v. Fisher*, 420 A.2d 427 (Pa. 1980)). According to Davis, Vaughn's provocation and the circumstances surrounding the altercation must also be considered when

determining whether Davis's belief as to the amount of force used was justified. Brief for Appellant at 24; *see also id*. (wherein Davis emphasizes that he was unarmed, had unsuccessfully tried to leave the bathroom, was being held by the neck by Vaughn, Vaughn was reaching for his gun, and that Davis fired the gunshots in rapid succession after managing to get a hold of Vaughn's second gun).

The trial court set forth the relevant law, addressed Davis's second issue, and concluded that it lacks merit. *See* Trial Court Opinion, 3/4/16, at 28-32. We agree with the reasoning of the trial court and affirm on this basis as to Davis's second issue. *See id*.

In his third claim, Davis contends that the trial court abused its discretion by sentencing him to an aggregate sentence of 30 to 60 years in prison based "solely on the seriousness of the crime and the impact on [Vaughn's] family, while ignoring substantial evidence that would have supported the imposition of a mitigated sentence." Brief for Appellant at 27.

Davis challenges the discretionary aspects of his sentence. "Challenges to the discretionary aspects of sentencing do not entitle an appellant to review as of right." *Commonwealth v. Moury*, 992 A.2d 162, 170 (Pa. Super. 2010). Prior to reaching the merits of a discretionary sentencing issue,

> [this Court conducts] a four part analysis to determine: (1) whether appellant has filed a timely notice of appeal, *see* Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify

sentence, *see* Pa.R.Crim.P. [720]; (3) whether appellant's brief has a fatal defect, [*see*] Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, [*see*] 42 Pa.C.S.A. § 9781(b).

*Moury*, 992 A.2d at 170 (citation omitted).

The determination of whether a particular issue constitutes a substantial question must be evaluated on a case-by-case basis. ***Commonwealth v. Roden***, 730 A.2d 995, 997 (Pa. Super. 1999). However, we will be inclined to allow an appeal where an appellant advances a colorable argument that the trial judge's actions were (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process. ***Id***.

In the instant case, Davis filed a timely Notice of Appeal. However, Davis preserved only a limited number of claims in his timely post-sentence Motion; namely, whether the trial court, in fashioning Davis's sentence, did not adequately consider (1) his history of mental illness; (2) that he acted under strong provocation; and (3) his lack of a criminal record for violent offenses. ***See*** Motion for Reconsideration of Sentence, 8/27/15, at 1-2. Although Davis included in his appellate brief a separate Rule 2119(f) statement, the only claims that were raised in that statement, *which were also included in his post-trial Motion*, were his claims that the trial court, in fashioning his sentence, failed to consider (1) his psychiatric history; and (2)

lack of a history for violent crimes.[2]  **See** Brief for Appellant at 26.  As such, Davis is in technical compliance with the requirements to challenge the discretionary aspects of a sentence with regard to these latter two claims. **Commonwealth v. Rhoades**, 8 A.3d 912, 916 (Pa. Super. 2010).  Thus, we will proceed to determine whether these two claims present a substantial question for our review.

Davis first argues that the trial court failed to adequately consider his mental health issues.  **See** Brief for Appellant at 29 (noting his difficult childhood, psychological problems, anger management issues and manic depression).  Notably, Davis does not allege that the trial court was *unaware* of his mental health issues.  Indeed, Davis indicates that, at the sentencing hearing, his counsel "highlighted [Davis's] lengthy history of documented mental health issues, including childhood depression and manifestations of bipolar disorder." **Id**. at 28.

This Court has held on numerous occasions that a claim of inadequate consideration of mental health issues does not raise a substantial question for our review.  **See Commonwealth v. Haynes**, 125 A.3d 800, 807 (Pa. Super. 2015); **see also Commonwealth v. Diaz**, 867 A.2d 1285, 1287

---

[2] To the extent that Davis attempts to raise additional discretionary aspects claims for the first time on appeal, we decline to review them.  **See Commonwealth v. Kennedy**, 868 A.2d 582, 593 (Pa. Super. 2005) (declining to address the merits of the appellant's challenges to the discretionary aspects of his sentence where such challenges were not specifically preserved in his motion to modify sentence).

(Pa. Super. 2005) (noting that, although "[m]ental illness is clearly a factor that may be considered in sentencing … it does not mandate a modification or reduction in any sentence that would or could be imposed.").

Moreover, the trial court had the benefit of a pre-sentence investigation report ("PSI"). **See** Trial Court Opinion, 3/4/16, at 35. Where a sentencing court is informed by a PSI, "it is presumed that the court is aware of all appropriate sentencing factors and considerations, and that where the court has been so informed, its discretion should not be disturbed." **Commonwealth v. Ventura**, 975 A.2d 1128, 1135 (Pa. Super. 2009) (citing **Commonwealth v. Devers**, 546 A.2d 12, 18 (Pa. 1988)). Thus, we conclude that this claim fails to present a substantial question for review.

Davis also claims that the trial court failed to adequately consider that, prior to the incident in question, he had never been convicted of a crime of violence. Brief for Appellant at 29.

As noted above, a claim that a sentencing court failed to consider or did not adequately consider certain mitigating factors does not raise a substantial question that the standard-range sentence was inappropriate. **See Commonwealth v. Lewis**, 911 A.2d 558, 567 (Pa. Super. 2006); **see also Ventura**, **supra**. Thus, we conclude that this claim fails to present a

substantial question for review.[3]   Accordingly, we cannot address Davis's sentencing claim.

Judgment of sentence affirmed.

Judgment Entered.

_Joseph D. Seletyn, Esq._
Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/19/2016

---

[3] Notably, with regard to his discretionary aspects of sentencing claim, Davis has not raised an issue that his sentence is "(1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." **Roden**, 730 A.2d at 997.

FILED

MAR 04 2016

Criminal Appeals Unit
First Judicial District of PA

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CRIMINAL TRIAL DIVISION

| COMMONWEALTH | : | CP-51-CR-0002634-2013 |
| | : | |
| vs. | : | |
| | : | |
| | : | SUPERIOR COURT |
| GARY DAVIS | : | 238 EDA 2016 |

BRINKLEY, J.                                         MARCH 4, 2016

## OPINION

Defendant Gary Davis appeared before this Court for a jury trial and was found guilty of third-degree murder, violations of the Uniform Firearm Act (VUFA) 6105 and 6106, possession of an instrument of crime (PIC), and recklessly endangering another person (REAP). This Court sentenced Defendant to 20 to 40 years state incarceration on the third-degree murder charge, 5 to 10 years state incarceration on the VUFA 6105 charge, 3 to 6 years state incarceration on the VUFA 6106 charge, and 2 to 4 years state incarceration on the PIC charge. This Court imposed no further penalty on the REAP charge. The sentences on all charges were to run consecutive to one another, for a total aggregate sentence of 30 to 60 years state incarceration. Defendant appealed the judgment of sentence to the Superior Court and raised the following issues on appeal: (1) Whether this Court erred when it allowed the Commonwealth to introduce other acts evidence; (2) Whether the evidence was sufficient to find Defendant guilty of third-degree murder and PIC; and (3) Whether the aggregate sentence imposed by this Court was excessive.

1

## PROCEDURAL HISTORY

On December 20, 2012, Defendant was arrested and charged with murder, VUFA 6105 and 6106, PIC, and REAP. From February 10 to February 17, 2015, a trial was held in the presence of a jury. On February 23, 2015, the jury found Defendant guilty of third-degree murder, VUFA 6106, PIC and REAP. On that same day, Defendant executed a valid waiver of his right to a jury trial and this Court found him guilty of VUFA 6105. On August 18, 2015, this Court sentenced Defendant to 20 to 40 years state incarceration on the third-degree murder charge, 5 to 10 years state incarceration on the VUFA 6105 charge, 3 to 6 years state incarceration on the VUFA 6106 charge, and 2 to 4 years state incarceration on the PIC charge. This Court imposed no further penalty on the REAP charge. The sentences on all charges were to run consecutive to one another, for a total aggregate sentence of 30 to 60 years state incarceration. On August 27, 2015, Defendant filed a motion for reconsideration of sentence, which was denied by operation of law on December 28, 2015. On January 6, 2016, Defendant filed a Notice of Appeal to the Superior Court. On February 8, 2016, after receiving the complete notes of testimony, this Court ordered Defendant to file a Concise Statement of Errors pursuant to Pa.R.A.P. 1925(b), and Defendant did so on February 19, 2016.

## FACTS

Trial began in this matter on February 10, 2015. Defendant was represented at trial by John McMahon, Esquire, while the attorney for the Commonwealth was Alisa Shver, Esquire. The Commonwealth called Officer Jason Wentzell ("Wentzell") as its first witness. Wentzell testified that he had been a police officer for 18 years and had been assigned to the 16th District throughout his career. Wentzell further testified that, on December 8, 2012, he was by himself when he got a call to respond to a shooting at a bar on 537 North 35th Street. Wentzell stated that

2

he was roughly three minutes away from the location and that, when he arrived on location, two police cars and three officers were already at the bar. Wentzell testified that, as soon as he entered the bar, the manager approached him and told him that the entire incident had been caught on videotape. Wentzell further testified that the manager showed him roughly 5 minutes of the footage and that he was able to identify Defendant as the shooter. Wentzell stated that he recognized Defendant from the area he patrolled and that he put Defendant's description over the police radio. Wentzell further stated that he left the bar and went to a nearby area Defendant frequented, but Defendant was not there. Wentzell testified that the area was right around the corner from the bar and that he arrived there in less than a minute. Wentzell further testified that he continued to look for Defendant during his shifts following the shooting, but was unable to find him. The Commonwealth then played Commonwealth Exhibit C-39 for Wentzell. Wentzell testified that the video depicted the bathroom area in the rear of the Easy Corner Bar. Wentzell further testified that he recognized Defendant and LeShay Hague ("Hague") in the video. (N.T. 2/10/2015 p. 96-112).

The Commonwealth called Albert Chu ("Chu") as its next witness. Chu testified that he had worked at the Philadelphia Medical Examiner's Office since July 2014 and previously had worked as an Assistant Medical Examiner at the Harris County Institute of Forensic Science in Houston for 9 years. Chu further testified that he completed a one-year forensic pathology fellowship at the Office of the Chief Medical Examiner for the State of Maryland, medical school at the State University of New York in Buffalo, and a residency training program in anatomic and clinical pathology at the Hospital of the University of Pennsylvania. Chu stated that he had performed over two thousand autopsies in his career and testified as an expert in the field of forensic pathology nearly one hundred times. The Commonwealth subsequently offered,

3

and this Court accepted, Chu as an expert in the field of forensic pathology. Id. at 121-24.

Chu testified that he did not perform the autopsy on the decedent, Irving Vaughn ("Vaughn") but had reviewed the report prepared by Dr. Gary Collins ("Collins") and was able to confirm the findings of the report, although he did not agree with all of its findings. Chu stated the first injury described was a perforating gunshot wound to the neck which injured the voice box, fifth cervical vertebrae, and spinal cord, as well as the skin and soft tissue. Chu further stated that the injury was potentially fatal and that Vaughn would have suffered instantaneous paralysis of all four limbs. Chu testified that Collins concluded that the entrance wound was on the front of the neck and the exit wound was on the back, but he did not agree with this finding. Chu further testified that, based on the photographs taken at the autopsy and the video of the incident, he believed that the bullet likely entered from the back and exited through the front of the neck. Chu stated that, based on the photographs from the autopsy alone, it was difficult to tell which wound was the entrance and exit wound and that it was his review of the video which made him believe that the entrance wound was on the back. Id. at 124-35.

Chu testified that the second injury was a gunshot wound to the left side of the back, while the third injury was another gunshot wound to the back which was lower than the second injury. Chu further testified that both wounds appeared to be entrance wounds and that there were corresponding exit wounds on the front of the chest. Chu stated that Vaughn had an additional gunshot wound to the left shoulder from which a bullet was recovered. Chu further stated that the wound was an atypical gunshot wound, based on its irregular abrasion and hole, and that something would have interfered with the bullet before it entered the body. Chu testified that Vaughn also had a perforating wound on the middle finger of his right hand. Chu further testified that the wound on Vaughn's finger had gunpowder stippling, which indicated that the

4

gun was within two feet of him when it was fired. Chu stated that, based on the atypical nature of the shoulder wound, it was possible that the bullet passed through Vaughn's finger and then went into his shoulder. Chu further stated that Vaughn had an abrasion of the skin on his forehead. Id. at 136-43.

Chu testified that Vaughn was 5'10" tall and weighed 170 pounds. Chu further testified that Vaughn tested positive for Promethazine and Codeine, which were commonly seen in prescription cough syrup, and ethanol. Chu testified that Vaughn's blood-alcohol content was .06, which was below the legal limit to drive. The Commonwealth then played Commonwealth Exhibit C-39 for Chu. Chu testified that he observed Vaughn walk out of the bathroom under his own power, which indicated that he could not have suffered the wound to his neck already, which resulted in instant paralysis. Chu further testified that, shortly after Vaughn exited the bathroom, he suddenly collapsed face forward and the gun appeared to be behind his head. Chu stated that the most likely explanation for Vaughn's collapse was that he had just received the neck wound and that the bullet had come from behind. Chu testified that the official cause of death was multiple gunshot wounds. Chu further testified that the two gunshot wounds to Vaughn's chest were life threatening and would have created internal and external bleeding that would have prevented Vaughn's left lung from functioning correctly. Chu stated that the wounds would have resulted in death within minutes. Chu further stated that neither the gunshot wound to the shoulder nor the wound to the right hand were immediately life-threatening. Id. at 154-63.

The Commonwealth called Officer Terry Tull ("Tull") as its next witness. Tull testified that he had been a police officer for 18 years and had been assigned to the crime scene unit for 6 years. Tull further testified that he responded to the Easy Corner Bar on December 8, 2012. Tull stated that he recovered a .45-caliber Winchester fired cartridge casing and a .45-caliber PMC

fired cartridge casing in the vicinity of a pinball machine near the rear of the property. Tull further stated that he collected two blood samples and recovered a copper jacket from a bullet in the vicinity of the bathroom. Tull testified that he recovered the lead core of a bullet, another .45-caliber fired cartridge casing and another copper jacket in the hallway near the bathroom and a bullet from the women's bathroom. Tull further testified that the bathroom was approximately three-feet wide and five-feet long. Tull stated that one shell-top Adidas sneaker was found on the floor next to the very edge of the bar while a cell-phone protective frame was found near the opening of the bar. Tull further stated that he never recovered a second shoe or a cell phone. Tull testified that he submitted the blood swabs to Criminalistics and the ballistic evidence to the Firearms Identification Unit. (N.T. 2/11/2015 p. 9-36).

The Commonwealth called Officer William Kozlowski ("Kozlowksi") as its next witness. Kozlowski testified that he had been a police officer for 10 years and had been assigned to the 16th District for 8 years. Kozlowski further testified that he responded to the Easy Corner Bar on December 8, 2012 for a shooting. Kozlowski stated that he was in a radio patrol car about a block-and-a-half away with his partner, Officer McGinnis ("McGinnis"), when they received the call. Kozlowski testified that he stopped the vehicle approximately two houses away from the bar and, as he and McGinnis approached the bar, he saw people walking very fast out of it. Kozlowski further testified that he and McGinnis entered the bar and stopped people from exiting it. Kozlowski stated that he went to the rear of the bar and saw Vaughn lying face down on the floor near the bathrooms. Id. at 50-55.

Kozlowski testified that he did not recognize Vaughn and noticed that Vaughn had been shot approximately three times in the torso area. Kozlowski further testified that he immediately radioed for medics and additional patrol cars. Kozlowski stated that medics were on the scene

6

immediately, as their station house was next door to the bar, and they flipped Vaughn over. Kozlowski further stated that he put his hand near Vaughn's nose area to see if he was breathing but he did not feel any breath. Kozlowski also stated that he did not see Vaughn move and that Vaughn did not speak to him. Kozlowski testified that medics took Vaughn out through the back of the bar and that McGinnis went with them. Kozlowski further testified that Wentzell had arrived at the bar by that time and together they went with the manager of the bar to review the surveillance video. Kozlowski stated that he watched the footage and recognized Defendant. Kozlowski further stated that Defendant stayed in the area of 600 North 34th Street and he went to that area the next day to look for him but did not find him. Kozlowski further stated that he continued to look in that area for the 5 or 6 days following the shooting but did not find Defendant. Kozlowski testified that, in addition to relaying Defendant's description over police radio, he also relayed the description of a black female and another male who had approached Vaughn while he was laying on the ground. Id. at 55-60.

The Commonwealth called McGinnis as its next witness. McGinnis testified that he had been a police officer for 6½ years and that he was working with Kozlowski on December 8, 2012 when they responded to a homicide at the Easy Corner Bar on 35th and Haverford. McGinnis further testified that Vaughn was face down and unresponsive when they first saw him and that medics turned him over. McGinnis stated that he went in the ambulance with Vaughn and that medical personnel handed him a bullet projectile and empty shell casing from the inside of Vaughn's jacket. McGinnis further stated that he placed those items on a property receipt and transported them to the Firearms Identification Unit. Id. at 67-70.

The Commonwealth called Maurice McDonald ("McDonald") as its next witness. McDonald testified that he was currently in custody for violating his probation and that he had an

7

open case for drug possession. McDonald further testified that he was on probation for picking up a handgun he found on Vaughn's body and giving it away. McDonald stated that he had known Vaughn since he was 9 years old and that the two of them became friends as he got older. McDonald further stated that he and Vaughn would hang out around 38th Street in West Philadelphia every day. McDonald testified that, on December 8, 2012, he and Vaughn went to the Easy Corner Bar at 35th and Haverford to get something to eat and drink. McDonald further testified that he and Vaughn did not go to the bar with anyone else and that they were at the bar for approximately 90 minutes. McDonald stated that he saw a couple women at the bar that he knew and that Vaughn had a pleasant conversation with someone that McDonald did not know. McDonald further stated that the atmosphere was friendly. McDonald testified that he was sitting in a chair eating when he heard a couple of gunshots. McDonald further testified that he jumped up and ran to the back of the bar, where he saw Vaughn dying. McDonald stated that he saw a gun hanging off Vaughn's side, so he took it off him and left the bar. McDonald further stated that he did not know that Vaughn had been carrying the gun and that he took it off Vaughn because he did not know that Vaughn was going to die and did not want Vaughn to get in trouble for the gun. Id. at 74-86.

McDonald testified that he was subsequently picked up by police and willingly went with them to the station for questioning. McDonald further testified that he remembered talking with Hague on the night in question and that Vaughn spoke with her as well. McDonald stated that he was sitting at the bar eating while Vaughn and Hague were talking and that, after she whispered in Vaughn's ear, the two of them went to the back of the bar together. McDonald further stated that he remembered seeing a man wearing an izar at the bar, but he did not pay any attention to the man nor did he remember seeing the man speak to Vaughn. McDonald testified that he heard

four or five gunshots from the back of the bar and that the people in the bar left in a panic. McDonald further testified that he assumed Vaughn was still in the back as he never saw Vaughn return. McDonald stated that Vaughn was laying face down on his stomach and that Vaughn turned his head towards him and moaned after he asked Vaughn if he was hit. McDonald further stated that Vaughn's head was the only part of his body that moved and that Vaughn was trying to nod his head. McDonald testified that it was around that time that he noticed the handle of a gun hanging off of Vaughn's waistband. McDonald further testified that the gun was a black and green semiautomatic. Id. at 86-99.

The Commonwealth then played Commonwealth Exhibit C-39 for McDonald. McDonald testified that he recognized Vaughn and Hague on the video, and that there was a man with cornrows wearing an izar that he did not recognize. McDonald further testified that Vaughn was carrying a drink and eating a piece of chicken. McDonald stated that Hague then grabbed Vaughn with her right hand and together they walked towards the bathrooms with the other man. McDonald further stated that, four minutes after Vaughn went towards the bathroom, he stood up and Hague ran towards him. McDonald testified that Hague was jumping up and down as she heard the gunshots. McDonald further testified that, thirty seconds later, he saw himself next to Vaughn's body taking the gun from him. McDonald further stated that he was charged with receiving stolen property and obstruction of law enforcement and that he pled guilty to the obstruction charge. McDonald testified that he had never seen that gun in Vaughn's possession, that he was not carrying a gun on himself that night, and that Vaughn did not seem to have any problems with anyone in the bar. McDonald further testified that he gave a statement to police on December 14, 2012 and that he identified a photograph of Hague at that time but was unable to identify anyone else in the photographs he was shown. Id. at 101-13.

9

The Commonwealth called Officer Norman DeFields ("DeFields") as its next witness. DeFields testified that he had been a police officer for 25 years and had been with the Firearms Identification Unit for 9 years. DeFields further testified that he had completed an in-house training program, and had gone to numerous armorer's courses, the New England manufacturers' tour, the ATF Serial Number Restoration School, the FBI Bullet Trajectory Reconstruction School and numerous Medical Examiners conferences. DeFields stated that he had been qualified as an expert in firearms identification and ballistics in state and federal court in Philadelphia. DeFields was subsequently offered and accepted by this Court as an expert in firearms identification. Id. at 126-30.

DeFields testified that he examined the ballistic evidence recovered at the Easy Corner Bar on December 8, 2012. DeFields further testified that he received four fired cartridge casings and that all of the fired cartridge casings were .45-caliber automatic-type. DeFields stated that all four fired cartridge casings were fired from the same gun, but he did not receive any firearm with which to compare to the fired cartridge casings. DeFields further stated that he received a copper-alloy full-metal jacketed bullet, B-1, which had a land and groove impression of six right. DeFields testified that the bullet's nose area was flattened and blood and tissue-like materials were attached to the base area. DeFields further testified that he received a second bullet from the scene, B-2, which had a land and groove impression of six right. DeFields stated that he received a third bullet, B-3, from the Medical Examiner's Office and that the bullet was a .45-caliber copper alloy with a land and groove impression of six right and no major deformation. DeFields further stated that he received two bullet jacket fragments, BJF1 and BJF2, which were consistent with being from the same fractured bullet jacket. DeFields testified that bullets 1

10

through 3 and bullet jacket fragments 1 and 2 were all consistent with having been fired from the same firearm. Id. at 131, 150-56.

The Commonwealth called Hague as its next witness. Hague testified that she was friends with Vaughn and that Defendant was her cousin. Hague further testified that she was on probation for forgery, theft by unlawful taking, receiving stolen property and access device fraud, and that she pled guilty to those offenses in October 2013. Hague stated that, on December 8, 2012, she went to the Easy Corner Bar with a friend at around 11 p.m. to have a drink. Hague further stated that the bar was busy that night and she recognized people from her neighborhood there, including Defendant, Vaughn, and McDonald. Hague testified that she had a pleasant conversation with Vaughn and McDonald but she could not remember whether Defendant and Vaughn ever spoke to each other that night. Hague further testified that Defendant and Vaughn were not friends but did not have any problems with each other. Hague stated that she did not remember what time the shooting took place. Hague further stated that she did not remember walking with Defendant and Vaughn to the bathroom area in the back of the bar or seeing Defendant and Vaughn together in the women's bathroom. Hague testified that she did not remember seeing Vaughn's body, hearing any gunshots or running out of the bar. Id. at 157-74.

Hague testified that police came to her house the next morning and brought her down to the Homicide Division at 8th and Race. Hague further testified that she watched the surveillance video with the detectives and gave a statement. The Commonwealth then played Commonwealth Exhibit C-39 for Hague. Hague testified that she recognized herself and Defendant in the video. Hague further testified that Defendant was wearing an izar and had a drink or cigarettes in his hands. Hague stated that the video showed her having a conversation with Vaughn and whisper something into his ear, but she could not remember what she said to Vaughn. Hague further

11

stated that the video showed her standing with Defendant about 8 minutes after she spoke with Vaughn, but she did not remember whether she spoke with Defendant. Hague testified that Defendant then walked towards the back of the bar and that she followed him. Hague further testified that, as she and Defendant walked to the back of the bar, she tapped Vaughn on his stomach and all three of them walked together towards the back of the bar. Hague stated that Vaughn was eating at the time and there did not seem to be any tension between Defendant and Vaughn. Hague further stated that there was no indication of any fight between them and neither of them indicated that they did not want to go to the back of the bar. Id. at 174-93.

Hague testified that, approximately 20 seconds after she walked to the back of the bar with Defendant and Vaughn, she walked away and began to talk with McDonald. Hague further testified that, 15 seconds later, the video showed Defendant close the door to the bathroom and her cousin, "Shi", enter the adjacent bathroom. Hague stated that, 100 seconds after Defendant closed the door to the bathroom, the video showed her motion towards Shi, engage in a conversation with him, and point in the direction of the bathroom. Hague further stated that, 30 seconds later, the door to the bathroom flew open and she looked into the bathroom. Hague testified that she saw Defendant and Vaughn fighting and ran. Hague further testified that she saw a gun but was not sure who had the gun. Hague stated that she did not remember what the gun looked like and that Vaughn was holding it up in the air as they were fighting. Hague further stated that she did not leave the area, even though she saw the gun, because she thought the fight would get broken up. Hague testified that, 4 seconds later, the video showed her jump up. Hague further testified that she jumped because she heard the shots, but did not remember how many shots she heard. Hague stated that it was at that point that she left the bar. Id. at 194-207.

12

Hague testified that, when she gave her statement to the police, her answers were not written down contemporaneously and she never reviewed her statement. Hague further testified that she refused to sign and date her statement, but she did so after viewing the video. Hague stated that she had not spoken to anyone in the courtroom about the case and had only seen her statement for the first time when it was shown to her by defense counsel two days prior. The Commonwealth then showed Hague the statement she gave to police. Hague testified that she saw her handwriting and the date she gave the statement on each page of the statement and the photographs attached to the statement. Hague further testified that the statement showed she was brought into Homicide by police at 8:35 a.m. and that she gave her statement at 8:50 a.m. Hague testified that the statement did not say anything about Vaughn holding a gun in the air nor had she previously told the District Attorney's Office that Vaughn was holding a gun in the air. Hague further testified that she was intoxicated and had not slept the night before when she gave the statement. Hague testified that she identified Defendant as the shooter to police but she only heard the gunshots and never saw who was shooting. (N.T. 2/12/2015 p. 7-23).

The Commonwealth then played Commonwealth Exhibit C-39 for Hague. Hague testified that the video showed her turn around with her hands in the air when Defendant fired at least one shot at Vaughn. Hague further testified that she was near the deejay booth when Vaughn collapsed and she was looking in the direction of Defendant, although she was unsure where exactly she was looking. Hague testified that she did not remember seeing Vaughn gripping Defendant by his shirt collar and did not remember what she saw when she looked at them in the bathroom stall. Hague further testified that she did not remember when she first saw the gun and that she had never seen a person carrying a gun before as she did not hang around people who carried guns. Hague testified Shi's full name was Shi Tyler and that he was

13

Defendant's half-brother. Hague further testified Shi and Defendant were not close, but had a friendly relationship. Id. at 24-34.

Hague testified that she remembered police asking her why Defendant and Vaughn went to the bathroom together and she gave the following answer, "to talk, it was a beef between [Vaughn], young boys, and [Defendant]." Hague further testified that the video showed Defendant standing in front of her and talking to someone in his vicinity shortly before walking to the back of the bar. Hague testified that she did not know whether they had a conversation or what that conversation would have been about. Hague further testified that the video showed Defendant walk past Vaughn 30 seconds later and that she then grabbed Vaughn by his stomach. Hague testified that she walked with Vaughn to the bathroom and that she stood in the doorway of the bathroom as Vaughn and Defendant were in there together. Hague further testified that she was talking to Vaughn at that time but she did not remember if Vaughn and Defendant were talking to each other. Hague testified that Defendant never said anything to her while he was in the bathroom with Vaughn and did not express any fear of being in the bathroom with Vaughn. Hague further testified that Vaughn did not seem to be angry. Id. at 36-54.

Hague testified that she stayed near the bathroom while Defendant and Vaughn were there and that Defendant's brother, Shi, at one point entered the bathroom next to them. Hague further testified that Defendant never asked her to talk to Vaughn and that she did not remember the content of her conversations with Vaughn or Defendant. Hague stated that she did not know that Defendant and Vaughn were going to talk to each other and that she did not set Vaughn up. Hague further stated that she did not speak to Defendant after talking to Vaughn and she did not facilitate their conversation in the bathroom. Hague testified that she did not ensure that Vaughn went into the bathroom with Defendant and that she did not stand guard near the bathroom while

14

they were in there. Hague further testified that she never motioned towards the bathroom they were in while she was speaking with Shi. Id. at 57-67.

The Commonwealth called Detective Robert Hesser ("Hesser") as its next witness. Hesser testified that he had been a police officer for 26 years and had been a detective with the Homicide Division for 10 years. Hesser further testified that he was the assigned detective for the killing of Vaughn and that he went to the scene after receiving notification that Vaughn had died. Hesser stated that he worked in conjunction with the Crime Scene Unit at the scene and that they collected one jacket, one sneaker, video, one set of keys, ballistics, blood, photographs and sketches from the Easy Corner Bar. Hesser further stated that the surveillance video was turned over to Detective James Dunlap ("Dunlap"). Hesser testified that he interviewed between 15 to 20 witnesses, including Hague. Hesser further testified a quantity of narcotics were recovered from the victim's body by officer DeJesus and placed on a property receipt. Hesser stated the narcotics included a glass jar with a black lid containing a purple liquid alleged to be syrup, 26 small Ziploc packets containing an off-white chunky substance alleged to be crack cocaine, seven small clear jars with yellow lids and a scorpion design with a green weed substance, and one clear plastic baggie containing a greed weed substance alleged to be marijuana. Hesser further stated that the crack cocaine was probably intended to be sold. Id. 100-10.

Hesser testified that Defendant was identified as the shooter and a warrant was issued for his arrest on December 8, 2012. Hesser further testified that Defendant was ultimately arrested on December 20, 2012 by the Homicide Division Fugitive Squad. Hesser stated that Defendant was arrested at 5308 Magnolia Street in the Logan neighborhood of Philadelphia and that the gun used to shoot Vaughn was not recovered. Hesser further stated he was never contacted by Defendant or anyone on Defendant's behalf in the time period between when the arrest warrant

was issued and when Defendant was ultimately arrested. Hesser testified that Defendant was 5'8" tall, weighed 155 pounds and listed his home address as 3223 Mount Vernon Street, which was near the Easy Corner Bar. Hesser further testified that DNA swabs were taken from Defendant and that he requested a comparison with the DNA samples collected from the scene. Id. at 110-22.

The Commonwealth called Detective Gregory Santamala ("Santamala") as its next witness. Santamala testified that he was present when Detective Jacobs conducted the interview with Hague on December 8, 2012. Santamala further testified that Jacobs typed Hague's answers verbatim and that Hague was given the opportunity to review her answers and make any corrections. Santamala testified that the statement was three pages long, with three photographs attached, and that Hague signed her name and the date on the statement and on each photograph. Id. at 143-49.

Santamala then read from the statement Hague gave to the police. Santamala testified that, in response to the question, "Can you please state in your own words what occurred during the shooting death of Irving Vaughn?" Hague gave the following answer,

> "I was up front with [Vaughn], playing with [Vaughn]. I seen [Vaughn] and [Defendant] walking off toward the bathroom. I grabbed [Vaughn's] hand and started walking with him. As I was still talking to him, I peep in the bathroom while [Vaughn] and [Defendant] was still in there, and I started playing with both of them, and I walked off. I started playing with Shi. Shi ran in the bathroom and waited until he came out and started talking to him. As me and Shi was talking, then we both heard the bathroom door fly open. We walk to the bathroom, and we peeped in, and I saw [Vaughn] had [Defendant] gripped up by his collar in the corner of the bathroom, and he was reaching in his waistband for the gun. They were tussling with a gun.
> I ran out of the bathroom to get help. I peep back around and seen [Defendant] halfway out of the bathroom, and shots were fired and I jumped back and ran."

16

Santamala further testified that Hague stated to the police that she saw Defendant shoot Vaughn and heard about three gunshots. Santamala testified that Hague identified photographs of Defendant, Vaughn, and McDonald and that she did not appear to be intoxicated during her statement. Id. at 149-55.

The Commonwealth called Dunlap as its next witness. Dunlap testified that he worked for the Philadelphia Police Homicide Unit and did most of the cellphone and video work for the unit. Dunlap further testified that he was part of a co-op with the FBI Digital Image and Video Response Team and that he had training from the FBI Audio/Video Unit at Quantico and the Law Enforcement Video Association out of Indianapolis University. Dunlap testified that he was one of the teachers in the Digital Image and Video Response Team with the FBI and that he had taught police officers from Baltimore, Boston and Seattle on best methods for recovery and storage of video. Dunlap further testified that he previously had been called as an expert in state and federal court in Philadelphia. Dunlap was subsequently offered and accepted by this Court as an expert in forensic video recovery and securing of the video assigned to him. Id. at 160-63.

Dunlap testified that there were nine cameras at the Easy Corner Bar and that he received video from cameras 2, 3, 5, 6, 7, and 8. Dunlap further testified that the time-stamp on the videos was running only 45 seconds fast and was therefore fairly accurate. Dunlap stated that he reviewed the footage with the assigned detective and made a compilation of the video. Dunlap further stated that he did not see any interactions between Defendant and Vaughn until the actual incident. Id. at 163-69.

The Commonwealth then read a stipulation that, at the time of the incident, Defendant did not have a valid license to carry a firearm in the city of Philadelphia. The Commonwealth further stipulated that if Benjamin Levin ("Levin") was called to testify, he would testify that he was a

17

forensic scientist with the City of Philadelphia and that he conducted a DNA report for items recovered from inside the bar and compared them to swabs taken from Defendant. Levin would further testify that, to a reasonable degree of scientific certainty, Defendant was the major source for the DNA found on the shoe, jacket, comb and hat recovered from the Easy Corner Bar. Id. at 173-75. After reading these stipulations, the Commonwealth rested. Id. at 176.

The defense called Gary Tyler ("Tyler") as its next witness. Tyler testified that he was Defendant's father and that he occasionally worked at the Easy Corner Bar. Tyler further testified that he was working the door at the Easy Corner Bar on December 8, 2012 and that, during that night, Defendant approached him and told him that he was worried about Vaughn's presence at the bar. Tyler stated that he told Defendant not to worry and enjoy himself. Tyler further testified that he had known Vaughn since he was a little kid and that he was friendly with Vaughn's family. (N.T. 2/13/2015 p. 4-8).

The defense called Defendant as its next witness. Defendant testified that he resided at 3223 Mount Vernon with his grandfather and, at the time of the shooting, his mother lived on Magnolia Street. Defendant further testified that he frequented the Easy Corner Bar on a regular basis to drink, sell marijuana and spend time with his friends. Defendant stated that, on December 8, 2012, he went to the bar by himself and arrived between 9:00 to 9:30 p.m. Defendant further stated that he was wearing black jeans, an izar, white Adidas sneakers and a black leather jacket. Defendant testified that he was carrying marijuana on the right side of his izar and that he also had his phone, charger, cigarettes and kufi on his person. Defendant further testified that he was not armed when he went to the bar and that he was not expecting any problems at the bar. Defendant stated that the bar was having a fish fry that night and it was a little busier than usual. Id. at 29-34.

18

Defendant testified that, once at the bar, he talked to people he knew, sold marijuana and drank. Defendant further testified that he eventually noticed Vaughn at the bar, which was unexpected as Vaughn and his friends usually drank at a bar on 37th and Aspen. Defendant stated that he was sitting at the front of the bar when Vaughn came in with McDonald, whom he did not know. Defendant further stated that he felt uneasy when he saw Vaughn, as it was unusual for him to be at the bar and because Vaughn was wearing a t-shirt with a picture of his cousin on it. Defendant testified that his friend had been charged with the murder of Vaughn's cousin but was acquitted at trial. Defendant further testified that Vaughn's cousin had been killed at the Easy Corner Bar. Defendant stated that he approached Tyler after he saw Vaughn and told him that he felt worried that Vaughn and McDonald were there. Defendant further stated that Tyler told him that it was alright. Id. at 35-42.

Defendant testified that there was a feud at that time between people who lived on 34th Street and people who lived on 38th Street. Defendant further testified that people who lived on 34th Street tended to frequent the Easy Corner Bar while people who lived on 38th Street tended to go to Candy's on 37th and Aspen. Defendant stated that he was feeling good and enjoying himself as the night wore on and was not looking for a confrontation with Vaughn. Defendant further stated that he was 5'6" tall and weighed 145 pounds at the time. Defendant testified that he was talking with one of Hague's friends when Hague approached him and said that Vaughn wanted to talk to him. Defendant further testified that he told her he did not want to talk with Vaughn because he was uncomfortable doing so. Id. at 42-47.

Defendant testified that he went to the bathroom to roll a marijuana joint. Defendant stated that he previously used the bathrooms at the bar to roll marijuana and that he used whatever bathroom was available. Defendant further testified that he did not expect Vaughn to

19

follow him to the bathroom and that he did not want to see Vaughn in the bathroom. Defendant stated that he had his back towards the open bathroom door while he rolled his marijuana and the music was too loud to hear anybody walking towards the bathroom. Defendant testified that he spent approximately 35 seconds rolling the marijuana and, when he turned around to leave the bathroom, he saw Vaughn standing near the sink. Defendant further testified that the bathroom was small and he was worried when he saw Vaughn standing approximately two inches in front of him. Defendant stated that he asked Vaughn, "What's up?" and Vaughn responded, "Close the door." Defendant further stated that Vaughn appeared to be a little drunk and high. Id. at 47-55.

Defendant testified that he peeked out the door of the bathroom to make sure McDonald was not outside waiting to jump him then shut the door. Defendant further testified that he did not leave the bathroom because he thought that he and Vaughn were going to have a friendly conversation. Defendant stated that he asked Vaughn, "What do you want to talk about?" and Vaughn replied, "You know I don't fuck with y'all down here like that." Defendant testified that Vaughn started making angry faces and balling up his fists so he tried to leave the bathroom but was pushed back by Vaughn. Defendant further testified that he smacked Vaughn's hand away from him and then a fight broke out between them. Defendant stated that Vaughn was bigger and stronger than him, and was throwing him around the bathroom. Defendant further stated that no punches were thrown, but they slammed each other against the walls. Id. at 55-59.

Defendant testified that, at one point during the fight, he was able to grab a hold of the doorknob and tried to run out but was unable to because Vaughn was grabbing him. Defendant stated that Vaughn had him gripped by his collar and pinned up against the wall. Defendant further stated that Vaughn's free hand was reaching for a gun in his waistband so he put his hand on Vaughn's wrist so he could not pull the gun out. Defendant testified that he could see the

black and grey handle of the gun and he had not known Vaughn was carrying a gun until then. Defendant further testified that he was scared that he was going to get killed when he saw the gun. Defendant stated that he saw the handle of another gun on the other side of Vaughn's waistband and he reached to grab that gun. Defendant further stated that on his second try he was able to grab hold of the gun and pull it out. Defendant testified that Vaughn then pushed him away and he was able to raise his arm and fire the gun. Id. at 59-66.

Defendant testified that he fired the gun because he was afraid for his life and that he was not aiming at any specific part of Vaughn's body. Defendant further testified that the time between when he grabbed the gun and when he fired was very quick. Defendant stated that, after he shot Vaughn, he concealed the gun in his izar, took three steps and then ran to the front door. Defendant further stated that, as he ran to the front door, McDonald tried to grab his ankle, which was how he lost his shoe. Defendant testified that he exited the bar and ran three block up Haverford Avenue toward 31st Street. Defendant further testified that he walked over the bridge towards North Philadelphia and threw the gun in the Schuylkill River. Defendant stated that he went to North Philadelphia because he had friends in the neighborhood. Defendant further stated that he called his brother, who picked him up and took him to their mother's house at 53rd and Magnolia in Germantown. Defendant testified that he found out that Vaughn died the next day and he contacted an attorney but was unable to afford one at that time. Defendant further testified that he was arrested on December 20, 2012 and did not resist when he was arrested. Id. at 66-72. After Defendant testified, the defense rested.

## ISSUES

I.    **WHETHER THIS COURT ERRED WHEN IT GRANTED THE COMMONWEALTH'S MOTION TO INTRODUCE OTHER ACTS EVIDENCE.**

21

II.   **WHETHER THE EVIDENCE WAS SUFFICIENT TO FIND DEFENDANT GUILTY OF THIRD-DEGREE MURDER AND POSSESSION OF AN INSTRUMENT OF CRIME.**

III.  **WHETHER THE AGGREGATE SENTENCE IMPOSED BY THIS COURT WAS EXCESSIVE.**

## DISCUSSION

I.    **THIS COURT DID NOT ERR WHEN IT GRANTED THE COMMONWEALTH'S MOTION TO INTRODUCE OTHER ACTS EVIDENCE.**

This Court did not err when it granted the Commonwealth's motion to introduce evidence of other acts to show motive. It is well established that the admissibility of evidence is solely within the discretion of the trial court and its decision will not be disturbed on appeal absent an abuse of that discretion. An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law or an exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record. Commonwealth v. Tyson, 2015 PA Super 138, 119 A.3d 353, 357-58 (2015) (citing Commonwealth v. Harris, 884 A.2d 920, 924 (Pa.Super.2005)).

Where the trial court has stated a "reason for its decision, the scope of review is limited to an examination of the stated reason." Commonwealth v. Weakley, 2009 PA Super 74, 972 A.2d 1182, 1189 (quoting Commonwealth v. Strong, 825 A.2d 658, 665 (Pa.Super.2003)). An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion. Commonwealth v. Perry, 612 Pa. 557, 32 A.3d 232, 236 (2011) (quoting Commonwealth v. Walls, 592 Pa. 557, 926 A.2d 957, 961 (2007)). To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party. Commonwealth v. Lopez, 2012 PA Super 161, 57 A.3d 74, 81 (2012). An evidentiary error of the trial court will be deemed harmless on appeal where the appellate court is

22

convinced, beyond a reasonable doubt, that the error could not have contributed to the verdict. Commonwealth v. Patterson, 625 Pa. 104, 91 A.3d 55 (2014) (citing Commonwealth v. DeJesus, 584 Pa. 29, 880 A.2d 608, 614 (2005)).

Evidence of a defendant's prior criminal activity is inadmissible to demonstrate his bad character or criminal propensity. Commonwealth v, Cox, 2015 PA Super 103, 115 A.3d 333, 337 (2015) (citing Commonwealth v. Collins, 70 A.3d 1245, 1251–1252 (Pa.Super.2013)). The same evidence may be admissible for various legitimate purposes, however, provided that its probative value outweighs the prejudicial effect likely to result from its admission, and an appropriate limiting instruction is given. Id. One such evidentiary purpose is to demonstrate the defendant's motive for committing the crime charged. Id. To be admissible under this exception, there must be a specific 'logical connection' between the other act and the crime at issue which establishes that the crime currently being considered grew out of or was in any way caused by the prior set of facts and circumstances. Id. (citing Commonwealth v. Ross, 57 A.3d 85, 100 (Pa.Super.2012)). Evidence that the defendant was involved in a drug distribution organization and that victim was involved in a rival organization is not improper evidence of prior bad acts, where it is relevant to show motive. See Commonwealth v. Collins, 2013 PA Super 158, 70 A.3d 1245, 1252 (2013) (citing Commonwealth v. Childress, 452 Pa.Super. 37, 680 A.2d 1184, 1187–88 (1996)). Although evidence of prior occurrences which is too remote is not properly admissible, it is generally true that remoteness of the prior instances of hostility affects the weight of that evidence and not its admissibility. Commonwealth v. Chamberlain, 612 Pa. 107, 30 A.3d 381, 420 (2011) (citing Commonwealth v. Drumheller, 570 Pa. 117, 808 A.2d 893, 905 (2002)).

1. **This Court did not err when it granted the Commonwealth's motion to introduce evidence that Defendant's and Vaughn's families were in an ongoing dispute arising out of drug dealing.**

This Court did not err when it granted the Commonwealth's motion to introduce evidence that Defendant's and Vaughn's families were in an ongoing dispute arising out of drug dealing. Moreover, even if this Court had granting the motion, any such error was harmless. Prior to trial, the Commonwealth filed a motion to admit evidence that there had been prior, ongoing violence between Defendant's and Vaughn's families arising out of drug dealing. The Commonwealth argued that the evidence was relevant to prove Defendant's motive to kill Vaughn and to explain why Vaughn and Defendant went to the bathroom to talk "about the young boys". The Commonwealth further argued that the case law routinely allowed evidence of rival drug dealing as a motive to commit murder. (N.T. 11/24/2014 p. 23-26). Defendant argued in response that the evidence was too vague to be probative and that allegations of drug dealing would present an extreme danger of unfair prejudice. Defendant further argued that, if the evidence of an ongoing dispute were to be admitted, this Court should omit any references to drug dealing. Id. at 27-31. This Court allowed the Commonwealth to introduce evidence that Defendant's and Vaughn's families were in an ongoing dispute arising out of drug dealing and cited to the cases provided by the Commonwealth in support. This Court noted that in Commonwealth v. Rogers, the Superior Court allowed evidence that the defendant was affiliated with a drug gang and had been tasked with watching the organization's drug houses where the defendant was on trial for murdering two members of a rival drug gang. *See* Commonwealth v. Rogers, 615 A.2d 55 (Pa.Super. 1992). This Court further noted that in Commonwealth v. Gwaltney, the Superior Court allowed evidence that the decedent and the defendant were members of a rival gang to establish defendant's motive for a stabbing and in Commonwealth v. Gelber, the Superior Court allowed

24

Gelber, the Superior Court allowed evidence of defendant's prior felony conviction for drugs to establish motive. *See* Commonwealth v. Gwaltney, 497 Pa. 505, 442 A.2d 236 (1982); *see also* Commonwealth v. Gelber, 594 A.2d 672 (Pa.Super. 1991). This Court stated the case law allowed evidence of rival gang activity so long as a cautionary instruction was issued. (N.T. 11/24/2014 p. 31-33).

This Court did not err when it granted the Commonwealth's motion to introduce evidence that Defendant's and Vaughn's families were involved in an ongoing dispute arising out of drug dealing. As this Court noted, the case law in Pennsylvania has consistently allowed evidence of rival gang activity involving drug dealing when that gang activity provided the motive for the defendant to murder the decedent. As the activities of the families in the instant case mirrored gang activity insomuch as they involved participants in rival groups who were engaged in drug dealing and occasional violence against members of the other group, the case law regarding rival gang activity providing motive was instructive for the case at hand. As Defendant's motive to kill Vaughn grew out of the longstanding hostility and prior acts of violence resulting from drug dealing between the two families, the evidence of such motive was admissible much as it would have been had Defendant and Vaughn simply been in more formal gang organizations. Moreover, even if this Court erred in granting the Commonwealth's motion to introduce the evidence, any such error was harmless. Aside from Hesser's testimony that various drugs were found on Vaughn's body, Defendant's own testimony that he was selling marijuana at the bar on the night in question and that his friend had been accused but acquitted in the murder of Vaughn's cousin, the jury heard no other evidence that Defendant or Vaughn were involved in drug dealing or that there was an ongoing dispute between Defendant's and Vaughn's families arising out of prior acts of violence and drug dealing. Furthermore, this Court instructed the jury

25

that it was only to consider evidence that Defendant was selling drugs at the Easy Corner Bar to show Defendant's activities at the bar and not to show criminal propensity or infer guilt. Specifically, this Court instructed the jury,

> "You have heard evidence tending to prove the defendant was guilty of selling drugs for which he is not on trial. I am speaking of the testimony to the effect that the defendant was selling drugs outside the Easy Corner Bar. This evidence is before you for a limited purpose: that is, to show – partially show the defendant's activities at the Easy Corner Bar.
> This evidence must not be considered by you in any other way other than the purposes I just stated. You must not regard the evidence as tending to show that the defendant was a person of bad character or criminal tendencies from which you may be inclined to infer guilt."

(N.T. 2/17/2015 p. 52). Therefore, it is exceedingly unlikely that the evidence could possibly have contributed to the jury's verdict, especially given the ample evidence which otherwise implicated Defendant. Thus, even if this Court erred in granting the Commonwealth's motion, any such error was harmless.

### 2. This Court did not err when it granted the Commonwealth's motion to introduce evidence that Defendant threatened Vaughn several months prior to the shooting.

This Court did not err when it granted the Commonwealth's motion to introduce evidence that Defendant threatened to kill Vaughn at a murder trial several months prior to the shooting. Moreover, even if this Court had erred in granting such motion, any such error was harmless. Prior to trial, the Commonwealth filed a motion to admit evidence that Defendant said to Vaughn, "you're next, nigga" during the trial of Defendant's friend, Tyree Berry, for the murder of Vaughn's cousin, Ronald Saunders, seven months prior to the shooting in the instant case. The Commonwealth argued that evidence that Defendant had threatened to kill Vaughn prior to the shooting was relevant to show motive in the instant case as well as to rebut Defendant's self-

26

defense argument by showing that Defendant was the aggressor in the instant case. (N.T. 11/24/2014 p. 23-26). Defendant argued in response that the evidence was unduly prejudicial given the spontaneous nature in which the shooting occurred as well as the fact that the threat occurred seven months prior to the shooting and there appeared to be no animosity between the two on the surveillance tapes. Id. at 27-31, 37-39, 41. This Court granted the Commonwealth's motion to introduce the evidence as the threat was very specific and admissible under the case law provided by the Commonwealth. Id. at 44-45.

This Court did not err when it granted the Commonwealth's motion to introduce evidence that Defendant threatened to kill Vaughn several months prior to the shooting. Contrary to Defendant's assertions, the threats Defendant made against Vaughn were highly probative of Defendant's intent and motive to kill Vaughn and rebutted Defendant's claims that the shooting was a spontaneous act of self-defense rather than a planned ambush. Moreover, the seven-month delay between when the threat was made and when the shooting occurred more properly went to the weight that the jury placed upon the evidence as opposed to its admissibility, especially in consideration of the fact that the threat was made in the context of an ongoing feud between Defendant's and Vaughn's families dating back to 2004. Furthermore, even if this Court had erred in granting the Commonwealth's motion to admit evidence that Defendant threatened to kill Vaughn several months prior to the shooting, any such error was harmless as the Commonwealth never actually introduced such evidence at trial. Therefore, the evidence could not possibly have contributed to the jury's verdict as the jury never heard the challenged evidence.

**II.**     **THE EVIDENCE WAS SUFFICIENT TO FIND DEFENDANT GUILTY OF THIRD-DEGREE MURDER AND POSSESSION OF AN INSTRUMENT OF CRIME.**

27

## 1. Sufficiency of the evidence.

A review of the sufficiency of the evidence to support a conviction requires that the evidence be reviewed in the light most favorable to the Commonwealth as verdict winner. Commonwealth v. Levy, 2013 PA Super 331, 83 A.3d 457, 461 (2013) (quoting Commonwealth v. Williams, 871 A.2d 254, 259 (Pa.Super. 2005)). The Commonwealth is also entitled to all favorable inferences which may be drawn from the evidence. Commonwealth v. Kelly, 2013 PA Super 276, 78 A.3d 1136, 1139 (2013) (citing Commonwealth v. Hopkins, 67 A.3d 817, 820 (Pa.Super. 2013)). The evidence put forth by the Commonwealth will be considered sufficient if it establishes each material element of the crime beyond a reasonable doubt, even if by wholly circumstantial evidence. Commonwealth v. Franklin, 2013 PA Super 153, 69 A.3d 719, 722 (2013) (citing Commonwealth v. Brewer, 876 A.2d 1029, 1032 (2001)).

When determining whether the evidence is sufficient to support a guilty verdict, the appellate court must examine the entire trial record and consider all of the evidence actually received. Commonwealth v. Graham, 2013 PA Super 306, 81 A.3d 137, 142 (2013) (quoting Commonwealth v. Brown, 23 A.3d 544, 559-60 (Pa.Super 2011)). However, the trier of fact is entitled to believe all, part or none of the evidence received at trial and the appellate court cannot substitute its judgment for that of the fact-finder. Commonwealth v. Fabian, 2013 PA Super 6, 60 A.3d 146, 151 (2013) (quoting Commonwealth v. Jones, 886 A.2d 689, 704 (Pa.Super. 2005)). The facts and circumstances established by the Commonwealth need not eliminate any possibility of the defendant's innocence; rather, any doubt is to be resolved by the fact-finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact could be concluded. Commonwealth v. Stays, 2013 PA Super 170, 70 A.3d 1256, 1266 (2013) (citing Commonwealth v. Aguado, 760 A.2d 1181, 1185 (Pa.Super. 2000)).

28

2. **The evidence was sufficient to find Defendant guilty of third-degree murder.**

The evidence presented at trial was sufficient to find Defendant guilty of third-degree murder. Third degree murder occurs when a person commits a killing which is neither intentional nor committed during the perpetration of a felony, but contains the requisite malice. Commonwealth v. Morris, 2008 PA Super 235, 958 A.2d 569, 576 (2008) (citing Commonwealth v. Tielsch, 934 A.2d 81, 94 (Pa.Super.2007). Malice is not merely ill-will but, rather, wickedness of disposition, hardness of heart, recklessness of consequences, and a mind regardless of social duty. Id. (citing Commonwealth v. Hardy, 918 A.2d 766, 774 (Pa.Super.2007)). Malice may be found where the defendant consciously disregarded an unjustified and extremely high risk that his actions might cause serious bodily injury. Commonwealth v. Dunphy, 2011 PA Super 100, 20 A.3d 1215, 1219 (2011) (citing Commonwealth v. DiStefano, 782 A.2d 574, 582 (Pa.Super.2001)). Malice may be inferred by considering the totality of the circumstances. Id. (citing Commonwealth v. Thomas, 440 Pa.Super. 564, 656 A.2d 514, 516 (1995)). Malice may be inferred from the use of a deadly weapon on a vital part of the victim's body. Commonwealth v. Ventura, 2009 PA Super 96, 975 A.2d 1128, 1142 (2009) (citing Commonwealth v. Gooding, 818 A.2d 546, 550 (Pa.Super.2003)).

A defense of "imperfect self-defense" exists where the defendant actually, but unreasonably, believed that deadly force was necessary. Commonwealth v. Truong, 2012 PA Super 8, 36 A.3d 592, 599 (2012) (citing Commonwealth v. Marks, 704 A.2d 1095, 1100 (Pa.Super.1997)). When a defendant raises the issue of self-defense, the Commonwealth bears the burden to disprove such a defense beyond a reasonable doubt. Ventura, 975 A.2d at 1143 (citing Commonwealth v. Bullock, 948 A.2d 818, 824 (Pa.Super.2008)). The Commonwealth

sustains this burden if it establishes at least one of the following: (1) the accused did not reasonably believe that he was in danger of death or serious bodily injury; (2) the accused provoked or continued the use of force; or (3) the accused had a duty to retreat and the retreat was possible with complete safety. Id. (citing Commonwealth v. McClendon, 874 A.2d 1223, 1230 (Pa.Super.2005)). The Commonwealth need only prove one of these elements beyond a reasonable doubt to sufficiently disprove a self-defense claim. Id. (citing Commonwealth v. Burns, 765 A.2d 1144, 1149 (Pa.Super.2000)).

In the case at bar, the evidence was sufficient to find Defendant guilty of third-degree murder. Chu testified that Vaughn suffered five gunshot wounds, including two potentially fatal wounds to the back of his torso and one to the back of his neck which resulted in immediate full-body paralysis. Chu further testified that the video at the scene showed Vaughn walk out of the bathroom under his own power, then a gun appeared behind his head and Vaughn collapsed forward, which Chu testified was consistent with Vaughn receiving the paralyzing wound to the back of his neck. Wentzell and Kozlowski each testified at trial that they viewed surveillance footage of the shooting and immediately identified Defendant as the shooter. Hague testified that she identified Defendant as the shooter to police. Moreover, the Commonwealth introduced sufficient evidence to disprove Defendant's claims of self-defense. Chu testified that Vaughn would have been paralyzed in all four limbs immediately after he received the gunshot wound to the back of his neck. However, the surveillance footage from the bar showed Defendant fire two additional shots into Vaughn's torso from behind. Chu testified that these two gunshots wounds would have resulted in internal and external bleeding that would have caused death within minutes. Furthermore, Defendant's own testimony belied his claims that Vaughn was the initial aggressor as Defendant testified that Vaughn told him that he did not want any trouble when they

30

were in the bathroom together. Additionally, Defendant's testimony that he was intimidated by Vaughn's presence at the bar was rendered incredible by surveillance footage of the incident as well as Hague's and Santamala's testimony, which indicated that Defendant set up the meeting in the bathroom. Thus, the Commonwealth provided sufficient evidence that Defendant killed Vaughn with malice when he shot him in the neck from behind and that Defendant continued to use deadly force against Vaughn after such force could not possibly have been necessary, due to Vaughn's paralysis. Therefore, the evidence was sufficient to find Defendant guilty of third-degree murder.

> 3. **The evidence was sufficient to find Defendant guilty of possession of an instrument of crime.**

The evidence presented at trial was sufficient to find Defendant guilty of possession of an instrument of crime (PIC). A person commits a misdemeanor of the first degree if he possesses any instrument of crime with intent to employ it criminally. 18 Pa.C.S.A. § 907(a). An instrument of crime is defined as "[a]nything specially made or specially adapted for criminal use" or "[a]nything used for criminal purposes and possessed by the actor under circumstances not manifestly appropriate for lawful uses it may have." Commonwealth v. Stokes, 2011 PA Super 261, 38 A.3d 846, 854 (2011). It is undisputed that a gun can be an instrument of crime. Id. Once the factfinder concluded that the defendant was the slayer and that the death resulted from the infliction of a gunshot wound, the factfinder could logically have concluded from all of the evidence that the defendant had possession of a gun, that the gun was an instrument commonly used for criminal purposes, and that his possession of the gun was, under the circumstances, not manifestly appropriate for any lawful use that the gun may have had. Commonwealth v. Buford, 2014 PA Super 224, 101 A.3d 1182, 1190 (2014) (citing Commonwealth v. Woodbury, 329 Pa.Super. 34, 477 A.2d 890, 893-94 (1984)).

31

In the case at bar, the evidence was sufficient to find Defendant guilty of PIC. Wentzell and Kozlowski each testified that they viewed surveillance footage of the shooting and immediately recognized Defendant as the shooter. Hague testified that she identified Defendant as the shooter to police. Chu testified that Vaughn died as a result of multiple gunshot wounds, including gunshot wounds to the back of his neck and torso, and that the surveillance video showed a gun behind Vaughn's head as he received the gunshot wound to the back of his head. Tull testified that he recovered copper jackets, fired cartridge casings and a bullet from the area in and around the bathroom. DeFields testified that the bullets and bullet jacket fragments recovered from the scene were all consistent with having been fired from the same firearm. Thus, there was sufficient evidence for the jury to conclude that Defendant had possession of a gun, that the gun was an instrument commonly used for criminal purposes, and that his possession of the gun was, under the circumstances, not manifestly appropriate for any lawful use that the gun may have had. Therefore, the evidence was sufficient to find Defendant guilty of PIC.

### III. THE AGGREGATE SENTENCE IMPOSED BY THIS COURT WAS NOT EXCESSIVE.

The aggregate sentence of 30 to 60 years state incarceration imposed by this Court was not excessive. Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. Commonwealth v. Johnson, 2015 PA Super 221, 125 A.3d 822, 826 (2015) (citing Commonwealth v. Disalvo, 70 A.3d 900, 903 (Pa.Super.2013)). In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision. Id. The rationale behind such broad discretion and the concomitantly deferential standard of appellate review is

32

that the sentencing court is "in the best position to determine the proper penalty for a particular offense based upon an evaluation of the individual circumstances before it." Commonwealth v. Williams, 2013 PS Super 151, 69 A.3d 735, 740 (2013) (citing Commonwealth v. Walls, 592 Pa. 557, 926 A.2d 957, 961 (2007)). The appellate court shall vacate the sentence and remand the case to the sentencing court with instructions if it finds: (1) the sentencing court purported to sentence within the sentencing guidelines but applied the guidelines erroneously; (2) the sentencing court sentenced within the sentencing guidelines but the case involves circumstances where the application of the guidelines would be clearly unreasonable; or (3) the sentencing court sentenced outside the sentencing guidelines and the sentence is unreasonable. In all other cases the appellate court shall affirm the sentence imposed by the sentencing court. Commonwealth v. Dodge, 2013 PA Super 253, 77 A.3d 1263, 1274 (2013) (citing 42 Pa.C.S. § 9781(c)). In reviewing the record, the Superior Court considers: (1) The nature and circumstances of the offense and the history and characteristics of the defendant; (2) the opportunity of the sentencing court to observe the defendant, including any presentence investigation; (3) the findings upon which the sentence was based; and (4) the guidelines promulgated by the commission. Id. (citing 42 Pa.C.S. § 9781(d)).

Where the trial court has the benefit of a pre-sentence report, the Superior Court presumes that the court was aware of relevant information regarding the defendant's character and weighed those considerations along with any mitigating factors. Johnson, 125 A.3d at 827 (citing Commonwealth v. Seagraves, 103 A.3d 839, 842 (Pa.Super.2014)). A pre-sentence report constitutes the record and speaks for itself. Commonwealth v. Best, 2015 PA Super 151, 120 A.3d 329, 348 (2015) (citing Commonwealth v. Devers, 519 Pa. 88, 546 A.2d 12, 18 (1988)). Having been fully informed by the pre-sentence report, the sentencing court's discretion should

33

not be disturbed. This is particularly true in those circumstances where it can be demonstrated that the judge had any degree of awareness of the sentencing considerations, and there the Superior Court will presume also that the weighing process took place in a meaningful fashion. Id. at 348-49. Thus, when the trial court has a pre-sentence investigation report, there is no merit to a defendant's assertion that the court did not consider his rehabilitative needs in imposing his sentence. Id. at 349.

In the case at bar, the parties were in agreement that Defendant had a prior record score of 4 (N.T. Sentencing 8/18/2015 p. 5). For the charge of third-degree murder with a deadly weapon enhancement, the offense gravity score was a 14, making the guideline range 186 months to the statutory limit, plus or minus 12. For the charge of VUFA 6105, the offense gravity score was a 10, making the guideline range 48 to 60 months, plus or minus 12. For the charge of VUFA 6106, the offense gravity score was a 9, making the guideline range 3 to 48 months, plus or minus 12. For the charge of PIC with a deadly weapon enhancement, the offense gravity score was a 4, making the guideline range 12 to 23 months, plus or minus 3. For the charge of REAP, the offense gravity score was a 2, making the guideline range 6 to 12 months, plus or minus 3. Id. at 5-7. This Court subsequently sentenced Defendant to 20 to 40 years state incarceration on the third-degree murder charge, 5 to 10 years state incarceration on the VUFA 6105 charge, 3 to 6 years state incarceration on the VUFA 6106 charge, 2 to 4 years state incarceration on the PIC charge, and imposed no further penalty on the REAP charge.

Thus, Defendant's sentence was within the range established by the sentencing guidelines and not unreasonable in light of the factors set forth in 42 Pa. C.S.A. § 9781(d). As this Court noted in imposing the sentence, Defendant's crime had a uniquely grave impact on the victim's family as Vaughn's and Defendant's families were related by blood and the woman who raised

34

Vaughn was in fact raising Defendant's close relative or child as well. Furthermore, this Court stated that Defendant had a long history of anger management issues, beginning when he was arrested at 16 for shoving a police officer at his school. This Court noted that, on January 25, 2009, Defendant was arrested for striking the mother of his child while she was holding their one-year-old. This Court further noted that Defendant punched the victim in the face, causing her to fall while holding the child, and continued to strike the victim despite his own family members trying to pull him away. Moreover, Defendant's claim that this Court did not consider his mitigating factors or rehabilitative needs is without merit as this Court had access to a pre-sentence investigation report, along with the Commonwealth and the defense's sentencing memos, and incorporated by reference those reports into the record. Therefore, the aggregate sentence of 30 to 60 years state incarceration imposed by this Court was not excessive.

## CONCLUSION

After a review of the applicable rules of evidence, statutes, case law and testimony, this Court committed no error. This Court did not err when it granted the Commonwealth's motion to introduce other acts evidence. The evidence was sufficient to find Defendant guilty of third-degree murder and possession of an instrument of crime. The total aggregate sentence imposed by this Court was not excessive. Therefore, this Court's judgment of sentence should be upheld on appeal.

BY THE COURT:

_____ J.